[Cite as *Carr v. Kaiser*, 2012-Ohio-2688.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
### DEFIANCE COUNTY

LISA M. CARR (FKA KAISER),

    PLAINTIFF-APPELLANT,          CASE NO.  4-11-11

    v.

JODY L. KAISER,                O P I N I O N

    DEFENDANT-APPELLEE.

**Appeal from Defiance County Common Pleas Court
Domestic Relations Division
Trial Court No. 01-DR-35048**

**Judgment Affirmed**

**Date of Decision:   June 18, 2012**

**APPEARANCES:**

    *Jennifer N. Brown*  for Appellant

    *Jody Kaiser,* Appellee

**SHAW, P.J.**

{¶1} Plaintiff-appellant Lisa M. Carr ("Lisa") appeals the July 28, 2011 judgment of the Common Pleas Court of Defiance County, Ohio designating Jody Kaiser ("Jody"), her former husband, residential parent and legal custodian of two of the parties' four minor children, Brooke Kaiser and Jesse Kaiser.

{¶2} Lisa and Jody's divorce was finalized on April 23, 2003. As part of that divorce, a shared parenting plan ("SPP") was instituted. Pursuant to the SPP, Jody and Lisa alternated two week periods of custody of their four children: Brooke, born 2-15-95, Jesse, born 2-14-96, Emily, born 12-1-98, and Kiera, born 9-15-00.

{¶3} On April 29, 2004, Lisa filed a motion to terminate the SPP and designate her as sole legal custodian. On February 14, 2005, after a hearing on the matter, the Magistrate issued a decision granting sole custody of the four children to Lisa. On February 28, 2005, Jody filed objections to the Magistrate's decision. On May 12, 2005, Jody's objections were overruled as he failed to file a transcript.

{¶4} On August 26, 2008, Jody filed a "motion for emergency temporary custody," a motion for a psychological evaluation of Lisa and a motion for a drug and alcohol evaluation of Lisa.

{¶5} On September 12, 2008, Lisa filed a motion for a psychological evaluation of Jody, a motion for suspension of Jody's companionship time, and a motion for contempt for failure to pay child support.

{¶6} On September 23, 2008, Lisa also filed a motion to require pre-payment of emergency room bills by Jody, a motion to require Jody to transport their children to activities during his parenting time, a motion to move exchanges to the Bryan City Police Department, a motion for contempt for failure to pay his share of out-of-pocket expenses, and a motion that Jody exercise companionship time during the first half of the summer.

{¶7} On September 25, 2008, at a pre-trial hearing, the Magistrate granted the cross motions for psychological evaluations subject to each party depositing the money for the evaluations, and granted the motion to move the location exchanging the children to the Bryan City Police Department. Neither party ever deposited the money required for the psychological evaluations so they were not undertaken.

{¶8} On December 1, 2008, Lisa filed a motion to appoint a Guardian Ad Litem ("GAL"). On March 3, 2009, Lisa moved for dismissal as Jody did not pay the GAL fees, or, in the alternative, to appoint a GAL for the limited purpose of interviewing the children so they did not have to keep being subpoenaed for hearings. On March 15, 2009, the motion to appoint a GAL for limited purpose of

interviewing the children was granted. Katrina Kight was subsequently appointed as GAL.

{¶9} On March 24, 2009, Jody filed a motion for continuance on the final hearing. That motion was denied the very same day.

{¶10} On April 17, 2009, a hearing on all pending motions was held. At the hearing, Lisa was represented by counsel and Jody proceeded *pro se*. In support of his "motion for emergency temporary custody," Jody testified and called 10 witnesses, one of which was the GAL speaking on behalf of the parties' four children. The GAL testified as to her interviews with the children and her perceptions. The GAL testified that mostly the children's complaints about living with their mother centered on Jeff Carr, Lisa's one-time husband now boyfriend. Based on her limited appointment and investigation, the GAL was unwilling to make a concrete recommendation as to what was best for the children.

{¶11} However, the GAL did say that while she usually thinks it is in the best interests of the children to keep them all together, she was not so sure in this case.

{¶12} The GAL felt that Brooke had made it "her life's work" to try to get her father awarded custody of the children and the GAL was not sure that Brooke could be re-directed in those efforts. (Tr. at 71). The GAL thought that Brooke was mature enough to make her own decision and that Brooke was upset she could

not appear in court to express how strong her desire was to live with her father. (Tr. at 61). But, the GAL did say that Brooke did not wish the children to be split up as Brooke felt it was her responsibility to look after the others. (Tr. at 65). As part of those attempts, Brooke encouraged the other children to write down anything negative that happened in Lisa's household, especially related to Jeff Carr, and reminded the other children of the alleged incidents.

{¶13} The GAL said that if Brooke went to live with her father "then there is an argument that perhaps some of this could come to an end and the children – the other three children might not be put in a position of having to be reminded of all the things that are either taking place or allegedly taking place at step-dad's behest so it could be a good thing." (Tr. at 119). The GAL reported that all four children expressed the desire to live with their father, but stated her opinion that only Brooke was mature enough to make such a decision though she stated that Jesse was closer than the young girls but not yet there. (Tr. 60).

{¶14} Of the other witnesses that Jody subpoenaed to the final hearing, many had little personal knowledge of the relationship between the parties and their children. Jody attempted several times to bring in evidence of conversations that had been recorded by Jody or Brooke, unbeknownst to those witnesses being recorded, that Jody or Brooke felt would be beneficial to his custody case. Lisa's counsel vigorously objected to the use of audio tapes each and every time Jody

attempted to use them stating that they could have been altered and lacked foundation. She also objected to the hearsay nature of the tapes. Due to the objections and Jody's lack of knowledge of courtroom procedure, Jody was unsuccessful in his attempts to bring in the audio tapes.

{¶15} After largely failing to elicit information from witnesses that he subpoenaed, Jody took the stand and testified as to why he felt the children should be in his care, stating that the situation had reached a boiling point, he feared for their safety and that the children were with him over half the time anyway.[1]

{¶16} After Jody testified, he called his last witness, Jeff Carr, Lisa's one-time husband now live-in boyfriend. While on the stand, Carr denied cursing at the children and standing them in corners for excessive amounts of time but impliedly admitted to standing them in corners. Jody then produced a letter which Carr identified as a letter Lisa had written to him. The letter read, in part:

> **calling them names & cussing at them the way you do isn't right—they're not adults. I've told you over & over to watch your mouth, to not call them names, but it didn't do any good. \* \* \* like all you feel towards the kids is pure hatred. \* \* \* I think alot** (sic) **of the kids attitudes are coming from the way they're being talked to.**

(Def.'s Ex. E).

---

[1] Jody claimed that the kids were with him 54-57 percent of the time already. As Lisa had sole custody, it is unclear when or where Jody received all his extra time, but the numbers that he used were not specifically disputed on cross examination.

{¶17} Jody attempted to further impeach Carr by playing an audio tape Brooke recorded that allegedly depicted Carr yelling at the children. When the tape was played, Carr said he could not make out the voice on the tape. Jody attempted to play the audio louder but Carr said he still could not make out the voice on the tape. Lisa's counsel then objected to the admission of the tape for lack of foundation as Jody admitted that Brooke had made the tape, not Jody, and Carr had not identified his voice. As the GAL had spoken already on behalf of Brooke, the Magistrate found that the audio tapes lacked foundation and did not admit the tapes into evidence.

{¶18} At the conclusion of Carr's testimony, Jody rested his case and requested that the Magistrate interview Brooke and Jesse. Lisa, through her counsel, elected not to put on any evidence in support of her motions or against Jody's and did not testify at the hearing. Lisa then moved to admit her exhibits into evidence and rested her case. The matter was thus submitted for decision by the Magistrate.

{¶19} On July 29, 2009, the Magistrate filed notice of his intention to interview the two oldest children, Brooke and Jesse. On August 7, 2009, the Magistrate interviewed Brooke and Jesse.

{¶20} On August 14, 2009, the Magistrate issued his decision on the pending motions awarding temporary residential parent status and temporary legal

custody of Brooke and Jesse to Jody.[2]  Under the Magistrate's decision, custody of the two youngest children remained with Lisa.

{¶21} On August 27, 2009, Jody filed objections to the Magistrate's decision.  On August 28, 2009, Lisa filed objections to the Magistrate's decision and a motion for findings of fact and conclusions of law.  On September 4, 2009, the Magistrate issued a decision asserting that there already were findings of fact and conclusions of law in his previous fourteen page opinion.

{¶22} On September 14, 2009, Lisa filed proposed findings of fact and conclusions of law.  On October 5, 2009, pursuant to a motion by Lisa, the Magistrate issued a stay on his decision pending the outcome of the objections.  On December 7, 2009, the common pleas court held a hearing on the objections to the Magistrate's decision.

{¶23} On March 30, 2011, over fifteen months after the December 7, 2009 hearing, the court issued its decision on the objections to the Magistrate's decision.  Noting that the case had been pending for an inordinate amount of time, the trial court stated that it had extensively examined the case in an attempt to analyze the case from all angles while conducting its independent review and analysis.  Ultimately the trial court agreed with the Magistrate.  On July 28, 2011, the court

---

[2] The designation of "temporary" custody by the Magistrate appears to be directed solely in recognition of the fact that the Magistrate's decision was subject to the independent review and approval of the common pleas court.

filed a judgment entry denying all objections and adopting the Magistrate's decision.

**{¶24}** This appeal followed and Lisa asserts four assignments of error for our review.

### ASSIGNMENT OF ERROR I.

**THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN GRANTING APPELLEE CUSTODY OF THE OLDEST TWO CHILDREN WITHOUT A MOTION PENDING FOR CHANGE IN CUSTODY AS THE COURT WAS WITHOUT JURISDICTION TO MAKE SAID CHANGE AND SAID CHANGE VIOLATED APPELLANT'S DUE PROCESS RIGHTS.**

### ASSIGNMENT OF ERROR II.

**IT WAS ERROR FOR THE TRIAL COURT TO MODIFY CUSTODY OF THE TWO OLDEST CHILDREN WITHOUT A SHOWING OF A CHANGE IN CIRCUMSTANCE.**

### ASSIGNMENT OF ERROR III.

**PRESUMING ADEQUATE CHANGE IN CIRCUMSTANCE, THE TRIAL COURT ABUSED ITS DISCRETION IN AWARDING CUSTODY OF THE TWO OLDEST CHILDREN TO THE APPELLEE BECAUSE A CHANGE IN CUSTODY WAS NOT IN THE BEST INTEREST OF THE MINOR CHILDREN.**

### ASSIGNMENT OF ERROR IV.

**IT WAS ERROR FOR THE TRIAL COURT TO REFER IN ITS DECISION TO EVIDENCE THAT WAS NOT PROPERLY ADMISSIBLE BEFORE THE TRIAL COURT IN ITS DECISION.**

*Standard of Review*

**{¶25}** Initially, we observe that child-custody determinations are some of the most difficult and agonizing decisions a trial court must make. Therefore, a trial court must have wide latitude in its consideration of the evidence. *Davis v. Flickinger*, 77 Ohio St.3d 415 (1997). Generally, when reviewing a ruling pertaining to the allocation of parental rights, the trial court is to be afforded great deference. *Miller v. Miller*, 37 Ohio St.3d 71 (1988). Thus, we will not reverse a child-custody decision that is supported by a substantial amount of competent, credible evidence absent an abuse of discretion. *Bechtol v. Bechtol*, 49 Ohio St.3d 21 (1990), syllabus. The term "abuse of discretion" connotes more than an error of judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Id.*

*First Assignment of Error*

**{¶26}** In Lisa's first assignment of error, she makes two arguments that the court was without jurisdiction to change custody of the two oldest children: (1) that there was no motion for change in custody pending before the court and (2) that because Jody testified that there was no reason he could recall as to why he

filed the "emergency" motion for custody in August of 2008, the motion should have been dismissed.

{¶27} The statute governing this case is R.C. 3109.04. In pertinent part, it reads,

> **(A) In any divorce, legal separation, or annulment proceeding and in any proceeding pertaining to the allocation of parental rights and responsibilities for the care of a child, upon hearing the testimony of either or both parents and considering any mediation report filed pursuant to section 3109.052 of the Revised Code and in accordance with sections 3127.01 to 3127.53 of the Revised Code, the court shall allocate the parental rights and responsibilities for the care of the minor children of the marriage. Subject to division (D)(2) of this section, the court may allocate the parental rights and responsibilities for the care of the children in either of the following ways:**
>
> **(1) If neither parent files a pleading or motion in accordance with division (G) of this section, if at least one parent files a pleading or motion under that division but no parent who filed a pleading or motion under that division also files a plan for shared parenting, or if at least one parent files both a pleading or motion and a shared parenting plan under that division but no plan for shared parenting is in the best interest of the children, the court, in a manner consistent with the best interest of the children, shall allocate the parental rights and responsibilities for the care of the children primarily to one of the parents, designate that parent as the residential parent and the legal custodian of the child, and divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, the responsibility to provide support for the children and the right of the parent who is not the residential parent to have continuing contact with the children.**

(R.C. 3109.04(A)(1)).

{¶28} We begin by addressing Lisa's argument that there was no "motion for change in custody" of the children filed in this case or pending at the time Jody's "emergency" motion was filed. At the outset we note that the above portions of R.C. 3109.04(A)(1) specify only the filing of a "pleading" or "motion." The statute does not require a motion for change of custody to contain any particular designation, title or caption in order to invoke the jurisdiction of the court to determine the allocation of parental rights.

{¶29} In the case *sub judice*, Jody, acting *pro se*, had filed for "emergency temporary custody" claiming that the children were being physically and mentally abused and that there was alcohol abuse in the home. (Doc. 119). Lisa, through counsel, filed, *inter alia*, a motion for suspension of Jody's companionship time and a motion to amend summer companionship time. (Docs. 128, 133). Thus there were several "motions" before the court pertaining to custody of the children. Lisa has provided no authority in her brief as to how these motions fail to qualify under the statute or how these motions would prevent the court, after a full hearing was held, from allocating parental rights under the statute. In fact, at least one other District Court of Appeals has expressed no difficulty reallocating custody rights after a full hearing following a motion for emergency temporary custody. *See Delly v. Delly*, 11th Dist. No. 2011-L-018, 2011-Ohio-6004 (ex-parte emergency temporary custody motion filed to prevent a mother from moving

away with a child, followed by a full hearing to determine custody surrounding the child).

{¶30} Moreover, throughout this case the parties both proceeded in contemplation of a full change of custody.[3] At the final hearing both the parties and the Magistrate asked questions that demonstrated a full apprisal that custody modification was at issue. For example, when asked to make an opening statement detailing why he was there, Jody states quite plainly that he wanted custody of the parties' four children. (Tr. at 12). And at the beginning of the hearing Lisa's counsel refers to Jody's pending motions as "his custody motions." (Tr. at 13). She then proceeds to make sure that nothing prior to the last custody hearing (pre-2005) is brought up at the hearing. And, later, while cross examining Jody, Lisa asks, "[s]o you want the Court to award you custody because you can afford the kids, but you can't afford to pay their medical bills?" (218).

{¶31} In addition, while the GAL was on the stand, Lisa's counsel rigorously cross-examined the GAL by asking questions consistent with a full recognition that custody was at stake. The following questions are taken from Lisa's counsel's cross-examination of the GAL.

---

[3] Notably some issues were resolved at the earlier hearings. A Judgment Entry dated September 26, 2008 granted the cross-motions for psychological evaluations subject to deposit and the motion to move the location of exchange. (Doc. 136). Another Judgment Entry appointing a GAL was filed after a subsequent hearing December 03, 2008. (Doc. 140). Both Entries set the matter for further hearing. Eventually the Final Hearing on all remaining pending motions was set for April 19, 2009.

**Do you believe that Brooke, based on your contact that you've had, seems overly involved in this custody battle currently filed by her father?**

**\* \* \***

**Would you agree that for the purposes of these children having an extended period where the parties are in Court fighting for custody, the longer that goes on the more harm that's doing to these kids because they're in the middle of this custody fight?**

**\* \* \***

**Knowing what you do of the kids, and I understand you may not have enough, but I'm just going to ask you, do you believe with children in general that if possible, the children should be kept together?**

**\* \* \***

**In this particular case do you believe it would be best, whatever the Court decides, to keep all four of the children together?**

**\* \* \***

**Would you agree that if the Court were to *temporarily or permanently* switch custody to Mr. Kaiser that there would be a change in the children's school?**

(Emphasis added.) (Tr. at 48, 55, 61, 62, 63).

**{¶32}** Not only did the parties act throughout the hearing as though a change in custody was contemplated, but the Magistrate also consistently treated the hearing as though a change in custody was at stake without addressing it in any

-14-

other manner. The following are examples of questions asked by the Magistrate throughout the hearing:

> **[To GAL] If Brooke were to move in with Jody on Monday would that be a good idea or a bad idea?**
>
> **\* \* \***
>
> **[To Jody] Why don't you start out by telling us why you want custody of all four children?**
>
> **\* \* \***
>
> **[To Jody] Okay why do you think the kids would be better off with you than where they are at this point?**
>
> **\* \* \***
>
> **[To Jody] Do you have anything else you want to state as to why you should – why the court should change custody from Lisa to you?**
>
> **\* \* \***

(Tr. at 118, 156, 159, 166).

**{¶33}** In sum, both parties and the Magistrate clearly conducted the hearing as a hearing on change of custody. Moreover, Lisa's counsel did not once object at the hearing on the basis of being unprepared to address the issue of permanent custody. We also note that Lisa declined to call any witnesses or testify herself at the final hearing. At the conclusion of Jody's case she merely entered her exhibits and rested perhaps thinking, as the Magistrate characterizes it in his decision, that

Jody had failed to meet his burden. Nevertheless, Lisa was certainly not precluded from putting on testimony. Nor did she ever argue or proffer any testimony that she claimed she would have presented had she known full custody was being litigated. She knew about the hearing months in advance, was represented by counsel, and had her counsel vigorously cross-examine witnesses where appropriate.

{¶34} Lisa next argues that the Magistrate should have dismissed the case when Jody stated while testifying that he did not really have an emergency reason for filing the motion for emergency temporary custody in August of 2008. Lisa bases her argument on the fact that the Magistrate *could* have properly dismissed the case, which the Magistrate acknowledged in his decision. However, inasmuch as the parties seemed to be fully apprised of the issues, and the court was at that point in the process of conducting a full custody hearing, we find it was within the Magistrate's discretion to proceed to allocate parental rights under these circumstances pursuant to R.C. 3109.04(A).[4]

{¶35} For these reasons, Lisa's first assignment of error is overruled.

---

[4] On appeal at oral argument Lisa's counsel argued that no jurisdictional affidavit was filed to comply with R.C. 3127.23. No objection was ever made before the Magistrate on this issue, this issue was not raised in Lisa's objections to the Magistrate's decision and this issue was not raised as an assignment of error in the brief before this court.

*Second Assignment of Error*

**{¶36}** In her second assignment of error, Lisa claims that the court erred in modifying custody without showing an adequate change in circumstances. R.C. 3109.04(E)(1)(a) authorizes a trial court to modify or terminate a prior decree allocating parental rights and responsibilities. The statute outlines what a court must consider in its determination of whether a modification of a prior custody decree is warranted. Specifically, R.C. 3109.04(E)(1)(a) states the following regarding a modification of prior custody decree:

> **The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies:**
>
> **(i)   The residential parent agrees to a change in the residential parent or both parents under a shared parenting decree agree to a change in the designation of residential parent.**
>
> **(ii)   The child, with the consent of the residential parent or of both parents under a shared parenting decree, has been integrated into the family of the person seeking to become the residential parent.**

> **(iii)  The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child.**

**{¶37}** When a court is asked to modify a custody decree, the initial determination to be made by the trial court is whether there has been a change in circumstances of the child or the residential parent since the prior court order. *Wyss v. Wyss*, 3 Ohio App.3d 412, 414, 3 OBR 479 (1982).  This finding should be made prior to weighing the child's best interest.  The purpose of requiring a finding of a change in circumstances is to prevent constant relitigation of issues that have already been determined by the trial court.  *Clyborn v. Clyborn*, 93 Ohio App.3d 192, 196 (1994).  Therefore, the modification must be based upon some fact that has arisen since the prior order or was unknown at the time of the prior order.  R.C. 3109.04(E)(1)(a).

**{¶38}** In reviewing whether the evidence presented in this case demonstrated that a change in circumstances has occurred, we are reminded that the change must be of substance, not slight or inconsequential.  *Flickinger*, 77 Ohio St.3d 415.  In addition, R.C. 3109.04(E)(1)(a) does not require that the change be "substantial," nor does "the change * * * have to be quantitatively large, but rather, must have a material effect on the child."  *McLaughlin v. McLaughlin-Breznenick*, 3d Dist. No. 8-06-06, 2007-Ohio-1087, ¶ 16, citing *Tolbert v. McDonald*, 3d Dist. No. 1-05-47, 2006-Ohio-2377, ¶ 31.

{¶39} In the fourteen page decision filed by the Magistrate in this case, the Magistrate found that there was a change of circumstance. In doing so he stated,

> **In determining whether a change of custody is warranted, the Court has considered all of the evidence presented and the entire interviews of the children, not just the facts summarized in this decision. The Court has review (sic) the prior decisions and Guardian reports. The court has also taken into account all relevant statutory factors.**
>
> **The Court finds that a sufficient change of circumstances has occurred for Jesse and Brooke in that they are mature enough and have sufficient reasoning ability now to tell the court which parent they want to live with. All other circumstances in this case, however, seem surprisingly similar to the circumstances of four years ago.**

{¶40} Lisa argues that the only change of circumstance cited by the Magistrate is the passage of time and that passage of time alone is not enough to constitute change of circumstances. *See Butler v. Butler*, 107 Ohio App.3d 633 (3d Dist. 1995).

{¶41} However, from the above passage it is clear that the Magistrate found that not only had several years passed, but also that both Brooke and Jesse had reached an age of sufficient reasoning ability, constituting a change in circumstances. A child crossing a developmental age in his or her life has been found to be enough, along with the passage of time, to constitute a change in circumstances. *Perz v. Perz*, 85 Ohio App.3d 374, 377 (1993).

{¶42} In *Perz v. Perz*, the Sixth District Court of Appeals found that the passage of time in a child's life from infancy to early adolescence is sufficient to warrant determining whether a change was in the best interests of the child. *Id.* The court in *Perz* noted an Ohio Supreme Court case, *Dailey v. Dailey*, 146 Ohio St. 93 (1945), which held that there is an "adequate change of circumstances when a child reaches the age where, under the law in effect at that time, the child could choose the custodial parent." *Id.* at 376 fn. 1, citing *Dailey*. The Sixth District continued by noting that R.C. 3109.04(B) does not provide such an age, but does state that a child with sufficient reasoning ability to express his wishes is a substantial factor. *Id.* Ultimately, the *Perz* court reasoned that, "[i]n applying the reasoning of *Dailey* to the statute in effect at the time of the hearing, we conclude that a child's attainment of 'sufficient reasoning ability' would be a substantial change in material circumstance such as would justify a further inquiry into the best interest of the child." *Id.*

{¶43} In this case, Brooke and Jesse were nine and eight years old respectively as of the last custody hearing.[5] At the time of the final hearing in this appeal, they were 14 and 13. The Magistrate notes that the GAL felt that "Brooke was mature enough and had sufficient reasoning ability to express her wishes as to her choice of parent." (Doc. 156). The GAL testified that in her opinion Jesse

---

[5] They were, however, 10 and 9 at the time the decision was filed awarding sole custody to Lisa.

was closer than the younger girls but perhaps not there yet. Jody Kaiser testified that he felt Brooke and Jesse were both mature enough to make a decision. The Magistrate interviewed Jesse and Brooke after the hearing and determined from that interview that they both were mature enough and had sufficient reasoning ability to make their own decision regarding where they wanted to live.

{¶44} Brooke and Jesse expressed repeatedly to the GAL and the Magistrate that they wanted to live with their father. The GAL testified that Brooke was upset she could not come to court to convey just how strongly her desire was to have Jody granted custody. Lisa argues that incidents such as Brooke distributing a flyer at school calling Lisa a bad mother and asking for financial and/or legal assistance to help get Jody custody are hardly indicative of any type of maturity that may have been possessed by Brooke and that the GAL stated Jesse was not quite mature enough to make a decision yet. However, giving due deference to the Magistrate who personally interviewed Jesse and Brooke, we find no abuse of discretion with the decision finding there was a change in circumstance based upon Brooke and Jesse's attainment of sufficient reasoning ability. Both the GAL and the Magistrate agreed on Brooke's reasoning ability. Though the GAL thought that Jesse was not quite there yet, the Magistrate acting as fact-finder disagreed and determined from his interview that Jesse did have sufficient reasoning ability.

**{¶45}** For the foregoing reasons, Lisa's second assignment of error is overruled.

*Third Assignment of Error*

**{¶46}** In her third assignment of error, Lisa argues that even presuming there was an adequate change in circumstances, it was not in Brooke and Jesse's best interest for Jody to be granted custody.  R.C. 3109.04(F)(1) provides a list of nonexclusive factors for the trial court to consider in determining the best interests of the children.  These factors include:

**(a)   The wishes of the child's parents regarding the child's care;**

**(b)   If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;**

**(c)   The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;**

**(d)   The child's adjustment to the child's home, school, and community;**

**(e)   The mental and physical health of all persons involved in the situation;**

**(f)   The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;**

Case No. 4-11-11

**(g)  Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;**

**(h)  Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; * * ***

**(i)  Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;**

**(j)  Whether either parent has established a residence, or is planning to establish a residence, outside this state.**

{¶47} In the Magistrate's decision, he thoroughly reviewed the unique and difficult nature of this case, ultimately finding that it was in Brooke and Jesse's best interest to live with Jody.  The decision, in pertinent part, reads:

**[u]nder the special circumstances of this case the Court sees little point in not honoring Brook's (sic) wishes to live with her father and it would be better for all concerned.  The Court finds that it is in her best interest that she live with her father at this time.  It is further believed that due to his age and maturity, it would be in Jesse's best interest that his wishes be accepted and that he lived with his dad.  In both cases, that unchallenged testimony suggests that both he and Brooke are staying with their dad more than half of the time anyway and the benefit already exceeds the harm of the change.**

(Doc. 156).

-23-

{¶48} Though not specifically listing each factor of R.C. 3109.04(F)(1) in his decision, the Magistrate did address the issues contemplated by the factors. The Magistrate interviewed Brooke and Jesse after the hearing and found, consistent with the GAL's interviews, that Brooke and Jesse strongly desired to live with their father. In making his decision, the Magistrate also factored in the uncontroverted testimony at the hearing that the children were already staying with their father over half of the time already, "and the benefit already exceeds the harm of a change." The GAL testified that Brooke informed her that the adjustment in changing custody would be minor as she already had friends in the area where her father lived.

{¶49} The Magistrate also considered the interrelationship of Brooke and Jesse to their siblings, the children's relationship with their parents, and the psychological and emotional effects of those relationships. In doing so, the Magistrate noted Brooke's emotional involvement in the custody case and Brooke's extreme measures undertaken to get her father custody.

{¶50} Early on Brooke took a letter Lisa had written to Carr and gave it to Jody in hopes that it would help Jody with the custody battle. Later Brooke regularly made audio recordings around Lisa's household in an attempt to

illustrate her living conditions.[6] She made a flyer that essentially called Lisa a bad parent and asked for financial and/or legal assistance to get Jody custody and distributed that flyer at her school. She also made videos and posted them to YouTube calling Lisa a bad parent, among other things. At Lisa's house Brooke encouraged the other children to write down anything bad that happened so that the younger children would remember and so that the incidents could be used in the custody battle. She and the other children even wrote letters to the court regarding the custody battle. Brooke had become what the GAL described as a "torch bearer" for her father in the custody dispute.

{¶51} Based on this, the Magistrate was concerned with Brooke's influence on the younger children. Further, he was concerned that because of Brooke's pressure on the younger children to record household incidents, especially those regarding Carr, the younger children were potentially not thinking independently. The record indicates the Magistrate's concern that keeping these kids together would result in Brooke's continued efforts to get her father custody, jeopardizing the relationship of the youngest children with their mother. Supporting the Magistrate's reasoning in his decision, the GAL testified that although typically it is better for children to be kept together, she was not so sure in this case.

---

[6] This resulted in Jody having a total of 62 audio recordings at the hearing, nearly all of which were not played due to the lack of foundation and Jody's lack of knowledge of courtroom procedure.

{¶52} As pointed out by the Magistrate, the children all complained about their relationship with Lisa's boyfriend, Jeff Carr. The GAL testified that the children all told her that Carr yelled and cussed at them. The children also told the GAL of alleged incidents where they were forced to stand in corners facing walls for excessive periods of time—one incident in which the youngest child supposedly passed out.

{¶53} The children informed the GAL that they all enjoyed staying with Jody. Conversely, Brooke clearly had issues with staying with Lisa. Jesse took no similar extreme position against Lisa, saying he merely desired to live with his father. The younger children, whom Jody was not awarded custody of, expressed dislike for the chores they had to do in Lisa's home and further dislike for Carr, but the Magistrate and the GAL noted that some of their dislike seemed to mirror Brooke's and could have been the result of her influence. In sum, the Magistrate factored into his decision the children's relationship with each other and with their parents as well as the psychological and emotional state of all those involved, including the children that he permitted to remain with Lisa.

{¶54} Furthermore, it is clear that the Magistrate considered factors of R.C. 3109.04(F)(1) that were not favorable to granting Jody custody. The Magistrate noted that there was "concern based on the testimony, the demeanor of the parties and the history of the case that if [Jody] gets custody of all the kids, he will be

much less flexible with parenting time than [Lisa]." (Doc. 156). The Magistrate continued, "the evidence both now and as reviewed in past decisions suggest that [Jody] will not encourage or cooperate in facilitating parenting time." *Id.* Further weighing against Jody was the fact that he owed Lisa money for uncovered medical expenses and past child support.

{¶55} After careful consideration of the above evidence, the Magistrate decided that the benefit of granting Jody custody of Brooke and Jesse exceeded the harm of the change. The Magistrate's decision reflects clear consideration of the factors listed above both weighing for and against the ultimate outcome. With competent credible evidence to support that finding, we find no abuse of discretion in the Magistrate's decision.

{¶56} After the Magistrate made his decision, both sides filed objections. The trial court then undertook an independent review and analysis of the record. The trial court noted in undertaking its independent review and analysis that the decision was pending for "an inordinate period of time" because

> **"[t]he disturbing circumstances presented before the Magistrate * * * caused the court to review and re-review on multiple occasions the evidence presented in an effort to try to arrive at a workable solution for the benefit of the children.**
>
> **\* \* \***
>
> **[T]he court has considered every possible alternative resolution of which the court could conceive, none of these appear**

**practicable or more likely to serve the best interests of the children in the result arrived at by the Magistrate.**

**{¶57}** As part of the Trial Court's independent review and analysis, the court stated that it even considered that neither parent was

**appropriate to designate at (sic) residential parent and legal custodian, which would result in either relative placement or transfer to the Juvenile Division. While having a certain appeal, this resolution, the court must conclude, would not ultimately serve the best interests of the children. It should be noted that "best" calls for a comparison of realistic alternatives.**

Ultimately the trial court held that the Magistrate's decision correctly reflected the best available resolution of a difficult situation. From the record it is apparent that the trial court thoroughly and independently reviewed the record and came to the same conclusion as the Magistrate. As there is substantial competent credible evidence to support the decision made by both the Magistrate and the trial court we find no abuse of discretion.

**{¶58}** Accordingly, Lisa's third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶59}** In her fourth assignment of error, Lisa argues that it was error for the trial court to refer in its decision to evidence that was not properly admissible before the court. Specifically, Lisa claims that the Magistrate improperly referred to a letter that she claims lacked foundation for introduction, and she claims that

the Magistrate improperly referred to an alleged partial tape recording of Jeff Carr that was played in court which Carr did not identify.

{¶60} Lisa's first argument is that the trial court erred in referring to a partial letter that she says lacked foundation for admission. The letter being referenced is one that Lisa allegedly wrote to Jeff Carr. Contained in the letter were statements by Lisa to Carr saying, *inter alia*, that Carr should not yell and cuss at the children as though they were adults.

{¶61} At the final hearing the GAL mentioned the letter, saying that Brooke informed her that after Brooke had taken the letter from Lisa's home, Carr regularly searched all the children's backpacks to make sure they were not taking anything out of the house that could be used in the custody dispute. Later, when Carr was on the stand, Jody produced the letter that Brooke had taken and asked Carr if he recognized it. Carr said he did. Jody proceeded to ask,

**Q: What is it?**

**A: A letter that Lisa wrote me.**

**Q: A letter that Lisa wrote you?**

**A: Yeah.**

**Q: Okay. Do you remember what all it said in that letter or anything about it?**

**A: Vaguely.**

(Tr. at 224). Lisa's counsel objected to the admissibility of the letter when Jody attempted to move the letter into evidence. The Magistrate stated, "I think he has sufficient – Mr. Carr has identified it as a letter to him from his – from Lisa. Okay, these are the three Exhibits [that] will be admitted." (Tr. at 236).

{¶62} A piece of writing may be authenticated under Evid.R. 901(B)(1) by testimony of a witness with knowledge that a matter is what it is claimed to be. Evid.R. 901(B)(1); *see also Bross v. Smith*, 80 Ohio App.3d 246, 251 (12th Dist. 1992). Given the broad discretion afforded trial courts in deciding the admissibility of evidence, we find no abuse of discretion in the Magistrate relying on this piece of evidence in his decision as it was properly authenticated and introduced into evidence by Carr's identification that the letter shown to him was the letter that was written to him by Lisa. *See Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271 (1991) (holding "a trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence."). Therefore, we find Lisa's first argument without merit.

{¶63} Lisa next argues that the Magistrate improperly relied in his decision on information gleaned from an audio tape that was inadmissible. The specific tape in question is allegedly of Carr yelling at the children. While Jody had Carr on the stand, Carr denied that he punished the kids excessively or cussed at them

and threw things around. (Tr. 223-224). In an attempt to impeach Carr, Jody played an audio recording that was made by Brooke, which would allegedly show that Carr was lying on the stand. Jody tried several times to play the recording, asking Carr if he recognized the voice on the tape. Carr said he could not make out the audio despite Jody's attempts to play it louder. When Carr could not identify the tape, the Magistrate found the tape lacked foundation and did not admit the tape into evidence.

{¶64} However, in his written decision, the Magistrate stated that the voice on the tape "seemed relatively clear to the undersigned and resembled Mr. Carr's voice as spoken in the Court room." (Dec. at 9). The Magistrate also stated that "[t]he brief portion of the tape heard for identification purposes demonstrated that there was a definite problem. Jeff Carr's action in screaming at [Brooke] and using the 'F' word were clearly inappropriate even if she was a troublesome teenager." (Doc. 156). As the trier of fact, the Magistrate is entitled to make such deductions that the denial or equivocation by Carr was disingenuous, or otherwise not credible and draw his own conclusion on the matter.

{¶65} Furthermore, the Magistrate also interviewed Brooke and asked her about the audio tape. Brooke stated that she had indeed made the tape and it was a tape of Carr yelling at her. Lisa argues that it was improper for the Magistrate "to lay the foundation for the admissibility of the tape" through the interview with

Brooke. However, as part of the interview process, the Magistrate is legitimately entitled to ask Brooke her reasons as to why she wants to live with Jody. As part of that reasoning, we believe Brooke can refer to incidents such as the one where she was being yelled at and also refer to the tape as a corroboration of her complaints. The decision does not state that the tape was again played in the interview, only that Brooke was asked about it. For these reasons, we find that it was not improper for the Magistrate to refer to the tape in his written decision.

{¶66} However, even if the Magistrate improperly referred to the audio tape in his decision, we find no prejudice to Lisa as the tape was merely cumulative to other evidence presented. The GAL had already given testimony from all four children saying how harshly Jeff Carr punished them at times. The letter from Lisa to Carr showed that even Lisa was concerned with the way Carr talked to the children. As such, any information taken from the brief tape excerpt was only cumulative to other evidence. Accordingly, Lisa's fourth assignment of error is hereby overruled and the judgment of the trial court is affirmed.

{¶67} For the foregoing reasons, Lisa's assignments of error are hereby overruled.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**