[Cite as *Hoying v. Hoying*, 2022-Ohio-2515.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | |
|---|---|
| PAMELA S. HOYING (nka BEY) | : |
| | : |
| | :    Appellate Case No. 2021-CA-15 |
| Plaintiff-Appellee | : |
| | :    Trial Court Case No. 2008-DIV-64327 |
| v. | : |
| | :    (Appeal from Common Pleas |
| JEFFREY J. HOYING | :    Court – Domestic Relations Division) |
| | : |
| Defendant-Appellant | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of July, 2022.

. . . . . . . . . . .

JENNIFER S. DELAPLANE, Atty. Reg. No. 0089521, 127 West Market Street, Troy, Ohio 45373
     Attorney for Plaintiff-Appellee

WILLIAM R. ZIMMERMAN, JR., Atty. Reg. No. 0078925, 108 East Poplar Street, Sidney, Ohio 45365
     Attorney for Defendant-Appellant

. . . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Jeffrey J. Hoying ("Jeff") appeals from a judgment of the Darke County Court of Common Pleas, Domestic Relations Division, which overruled his objections to the magistrate's decision, designated Plaintiff-Appellee Pamela S. Hoying, now known as Pamela Bey ("Pam"), the residential parent and legal custodian of their minor child, L.H., and ordered Jeff to pay child support. For the reasons that follow, the trial court's judgment will be affirmed.

I.      **Procedural History and Facts**

{¶ 2} Pam and Jeff were granted a final decree of divorce in February 2010. At that time, Pam was designated the residential parent and legal custodian for the parties' five minor children: Alysia, Justin, Kyle, Jared, and L.H. Jeff was granted parenting time and ordered to pay child support.

{¶ 3} In October 2012, Jeff filed a motion for reallocation of parental rights and responsibilities primarily as a result of Pam's marrying Aaron Bey, a convicted sex offender. In July 2013, the parties entered an agreed order reallocating parental rights and responsibilities wherein Jeff was designated the residential and custodial parent for the four youngest children: Justin, Kyle, Jared, and L.H. The eldest child, Alysia, had turned 18 years old and was emancipated. Pam was granted parenting time and ordered to pay child support.

{¶ 4} Shortly thereafter, Pam filed a motion for reallocation of parental rights and responsibilities alleging that Jeff had conducted himself inappropriately with L.H. at Jeff's residence. In May 2014, the parties entered another agreed order which slightly

modified the July 2013 agreement solely with regard to Pam's parenting time for Justin.

**{¶ 5}** In January 2020, Pam filed an ex parte motion for immediate temporary and permanent custody of L.H., the only remaining minor child of the parties, along with a request for child support. Pam filed the motion after 15-year-old L.H. disclosed that Jeff had been touching her inappropriately. The trial court granted Pam's ex parte motion and custody of L.H. was immediately given to Pam, with Jeff's parenting time suspended. Jeff opposed the ex parte order's grant of custody and filed a separate motion for contempt regarding Pam's failure to pay her share of uninsured medical bills incurred on behalf of the minor child and for overpayment of spousal support.

**{¶ 6}** On April 6, 2020, the trial court ordered that Jeff exercise parenting time at EUM Church under the supervision of EUM Church. On August 6, 2020, Pam filed an ex-parte motion for immediate suspension of Jeff's parenting time, alleging that on August 5, 2020, during a joint family session with Jeff's family, Jeff placed his hand on L.H.'s inner thigh. The trial court denied the request.

**{¶ 7}** On October 15, 2020, Jeff filed a motion for temporary unsupervised parenting time and holiday parenting time. The trial court granted Jeff's motion and ordered parenting time to be exercised every Sunday from noon until 3 p.m. and also for those hours on Thanksgiving. The visits were to be supervised by Jeff's wife, Renee.

**{¶ 8}** On November 20, 2020, Pam filed an emergency motion to suspend Jeff's parenting time as a result of an allegation that L.H. had an emotional break-down at school on November 9, 2020, after having had a visitation with Jeff the day before. L.H. claimed that Jeff had grabbed and squeezed her butt during pictures. L.H. reported the

incident to her principal, who reported the incident to Children Services. After a hearing was held on the motion, on November 30, 2020, the trial court allowed Jeff to continue exercising parenting time as previously scheduled on Sunday afternoons and for holidays. Renee was again ordered to supervise the visitations.

{¶ 9} On February 4, 2021, Jeff filed another motion requesting additional parenting time. Pam did not oppose additional time but objected to unsupervised overnight visitations and also requested that visitations be supervised by one of L.H.'s siblings. The trial court increased Jeff's parenting time on the weekends and included an additional visitation on Wednesday evenings, but it ordered that the parenting time was still to be supervised by Renee. The trial court did not allow overnight visitations.

{¶ 10} During the course of the proceedings, the guardian ad litem ("GAL") who had previously been involved in the family's divorce proceedings, was again appointed for these proceedings. Additionally, Dr. Gordon Harris was appointed to perform psychological evaluations. Both of these witnesses, along with several others, testified at the final hearing, which was held on April 22 and 23, 2021. The following evidence was presented:

{¶ 11} Mercer County Sheriff's Deputy Sergeant Rachel Heinl testified that, on November 15, 2020, she responded to a call that L.H. had run away from Jeff's residence to a neighbor's home. When Sgt. Heinl met with L.H., L.H. was very distraught and crying. L.H. repeatedly stated she was worried for her safety and would harm herself if she had to return to her father's residence. L.H. also disclosed that the Sunday before, the family had been taking pictures together and her father had placed his hand on her

butt. L.H. explained that she did not say anything at the time of the incident but, when she came back for a visit on November 15, 2020, Jeff told L.H.'s brother to go to the basement and she immediately got scared. Jeff brought up the allegations of him touching her the prior week and L.H. got scared and ran out the door to the neighbor's home. Based on her observations of L.H., Sgt. Heinl believed L.H. was clearly scared for her safety.

{¶ 12} Eric Rosenbeck, the principal and an English teacher at L.H.'s high school, testified that he had had a lot of interaction with L.H. over the past two years. During 2020, Rosenbeck saw L.H. frequently as she was dealing with a lot emotionally, mostly involving her father and her family. As a mandated reporter, Rosenbeck made two separate reports to Children Services based on L.H.'s disclosures that her father had touched her inappropriately.

{¶ 13} Rosenbeck explained that L.H. had changed significantly from freshman year to sophomore year. Rosenbeck described that on several occasions in 2020, L.H. would come to school with difficulties that would affect her ability to remain in the classroom. L.H. would appear very upset, crying, and breathing hard. The disruptions correlated with disclosures or in combination with L.H.'s visits with Jeff. L.H. would visit with her father on a Sunday and then come to school on Monday with difficulties. Sometimes the school could get L.H. to calm down enough to stay or have Pam talk to L.H. on the phone to keep her in school. Other times, when L.H.'s crying and disrupting the classroom were too much, Pam would pick up L.H. from school and take her home. This occurred frequently in 2020, but did not occur in 2021. L.H. seemed to be in a much

better place since January 2021. According to Rosenbeck, L.H. was doing better because her brother Jared was going to Jeff's visitations with her and that had helped her with whatever was going on. L.H. was receiving good grades, A's and B's, with the exception of geometry. L.H.'s overall disposition at the time of the hearing was the best he had seen in the past two years.

{¶ 14} Morgan Carter, a licensed social worker with Family Health, testified about her counseling sessions with L.H., which began in February 2020. Carter diagnosed L.H. with post-traumatic stress disorder (PTSD) and moderate major depressive disorder. L.H. described her biggest stressors as interactions with her father as well as school. L.H. often expressed worry about things at her dad's house such as getting yelled at or getting in trouble and inappropriate situations. L.H.'s symptoms included stomach aches, decrease in appetite, nightmares, and trouble sleeping, which would increase in correlation with L.H.'s visits with her father. L.H. was prescribed medication to help her sleep and at one point was taking Zoloft too.

{¶ 15} As a mandated reporter, Carter made a report to the police and/or children services agency after L.H.'s first session in February 2020, another in March 2020 involving L.H.'s older brother Kyle, and again in November 2020. In the first session, L.H. reported that Jeff had touched her inappropriately, which Carter reported. In the March 2020 report, L.H. reported that she saw Renee hit Kyle, who was L.H.'s older adult brother and an adult but was disabled and under a guardianship of Jeff. The final report was made on Monday, November 9, 2020, after L.H. had a breakdown at school and informed Carter that Jeff had put his hand on her butt cheek and grabbed it during a family

photo session the day before. L.H. appeared in significant distress when she made the disclosures to Carter.

**{¶ 16}** Carter had concerns of self-harm for L.H. based on statements L.H. had made to her throughout their sessions. L.H. had previously made a suicide attempt in February 2019 and was hospitalized at Parkview after trying to overdose on pills. On September 30, 2020, L.H. expressed suicidal ideations because she thought she was going to return to Jeff's home. On October 30, 2020, L.H. burst into tears after informing Carter that she would have increased visitations with her father. After the November 9, 2020 disclosure, where L.H. claimed Jeff had grabbed her butt, Carter met with L.H. for a regularly scheduled session the following day. She then saw L.H. again on November 13, 2020, due to an increase in anxiety and other symptoms of stress. L.H. reported that she was concerned Jeff would touch her inappropriately. Then, during L.H.'s next visitation with Jeff, L.H. ran away from Jeff's home to the neighbor's house. Carter had a crisis session with L.H. on November 16, 2020, at which L.H. reported she felt suicidal again but denied any plan or intent.

**{¶ 17}** Carter was aware that there had been prior allegations made against Jeff regarding inappropriate touching by both Alysia and L.H. that had been unsubstantiated. L.H. admitted to Carter that what she said had happened with Jeff in 2013 did not actually happen. However, she never recanted the 2020 disclosures and L.H.'s concerns and reports were consistent throughout the time Carter met with her.

**{¶ 18}** Pam testified that she received a Snapchat photograph from L.H. on December 31, 2019, showing Jeff asleep on L.H.'s bed. She told L.H. that if Jeff was

doing anything that made her uncomfortable, she needed to tell someone. At that time, L.H. was spending the Christmas break with Jeff. L.H. reported the incident to Rosenbeck when she returned to school on January 2, 2020. Pam also reported the photograph to the Mercer County Sheriff's Office, which called Children Services. Shortly thereafter, Pam filed the ex parte motion for custody.

{¶ 19} Pam was concerned that L.H.'s mental health would deteriorate if she returned to Jeff's custody. L.H. had attempted suicide in the past with an attempted overdose in February 2019. Pam claimed that Jeff did not tell her that L.H. had attempted suicide but instead that she had taken one extra pill by accident. She later learned that it was taken intentionally when she received reports from the facility to which L.H. went for treatment.

{¶ 20} Pam denied trying to influence L.H. or any of the other siblings to make allegations against Jeff. She denied trying to alienate Jeff or interfere with his relationship with any of their children and alleged that he had alienated her from their son Kyle. She explained that after Jeff got the guardianship of Kyle, she was no longer allowed to see Kyle.

{¶ 21} Pam claimed that L.H. had a difficult time with Jeff's visitations but that once one of her older brothers went with her, then L.H. seemed to do better. During a supervised visitation with Jeff at EUM Church, Pam was called to return early because the visitation had not gone well. After visitations with her father, either in person or virtual, L.H. would be very stressed and emotional, and she would often become very quiet or go to sleep. Once visitation with Jeff moved to in person at his home, L.H.

begged Pam not to have to go. Based on L.H.'s reactions, Pam sought advice on how to help with L.H.'s coping skills at home.

{¶ 22} According to Pam, L.H. was adjusted to her residence and the household members, which included Pam's husband Aaron, L.H., and Jared. L.H. frequently saw her brother Justin too. Pam reported that L.H. was doing better in school and that L.H. had two or three friends that L.H. talked to regularly. Although Pam lived in the Ansonia school district, she had no intention of changing L.H.'s school if she were to be designated the residential custodian.

{¶ 23} Pam stated that she was not trying to cut Jeff out of L.H.'s life, but she wanted L.H. to be safe and wanted Jeff to seek help. She also believed that Jared attending the visitations was effective and appropriate and asked for that to continue.

{¶ 24} Jared, the closest sibling in age to L.H., testified that he lived with Pam and graduated from high school in 2019. He had concerns that L.H. had thoughts of harming herself and seemed very stressed. In November 2020, L.H. asked him to go to Jeff's visitations with her, so he did. Jared supervised L.H.'s visits to make sure nothing happened and to protect her from being touched inappropriately. However, he stated that he normally hangs out in the basement with Kyle during visits, so he did not see everything that happened during the visits.

{¶ 25} According to Jared, he had a very good relationship with his mother and he loved his dad, but was not close with him. Jared had never heard Pam tell anyone to lie or tell L.H. what to say. He denied that Pam stopped or prevented him from having a relationship with Jeff. Jared believed that it would be best for L.H. to remain in Pam's

custody, and he was willing to continue accompanying L.H. to visits with Jeff.

{¶ 26} Alysia, L.H.'s sister, testified that she graduated high school in 2013 and lived in West Carrollton, Ohio. Although Alysia worked as an assessment case worker for Greene County Children Services and was a mandated reporter, the only report she ever made was while she was in college and L.H. initially talked about concerns. Alysia was concerned that L.H. was being sexually abused at Jeff's home based on L.H.'s odd behaviors and from what L.H. had reported to her.

{¶ 27} Alysia had a good relationship with her mother and they talked regularly. Alysia did not have any contact with Jeff at all and had not been to his house since she was around 13 or 14 years old. The last time she had seen Jeff was at Jared's graduation. Alysia testified that Jeff sexually abused her when she was younger and that he would come into her room at night, lay in her bed, and touch her inappropriately. She reported to law enforcement twice that she was sexually abused by Jeff, and these reports were both investigated. She admitted that she recanted one of the reports but could not recall when the second report was made.

{¶ 28} According to Alysia, she never heard Pam ask L.H. to say anything untruthful. She also claimed that Pam did not alienate L.H. or any of her siblings from Jeff. However, she claimed that Jeff alienated the siblings from Pam.

{¶ 29} Justin, L.H.'s oldest brother, graduated from high school in 2015 and lived independently from of both his parents. Justin explained that his father had custody of him until he turned 18 years old, at which point he left his father's house. He and L.H. texted every so often and he started accompanying Jared and L.H. when she had

visitations with Jeff. However, it brought back a depressing stage for him and he did not want to go back to Jeff's house. Justin stated that he had tried multiple times to reach out to Jeff, but that every time he opened himself up, his father hurt him. He claimed that Pam tells the truth and that she was not trying to drive a wedge between L.H. and Jeff's relationship. Instead, Justin testified that Jeff was known to lie and that Jeff was driving a wedge between L.H. and Jeff's relationship. Justin was concerned for L.H. if she had to return to Jeff's residence, because he was afraid Jeff would touch her inappropriately.

{¶ 30} Aaron, Pam's husband, testified that he was a deacon at their church and was in good standing in the community. He testified that Pam is fair and truthful and that he had never heard her ask anyone to lie for her. He believed that Pam encouraged a positive relationship between L.H. and Jeff and that Pam did not try to alienate L.H. or any of the other children from Jeff. On the contrary, he claimed that Jeff actually alienated the children from Pam. Aaron acknowledged that he was a convicted sex offender and that the victim of his prior offense was a teenager. However, he had not had any new offenses since his conviction.

{¶ 31} Jeff, L.H.'s father, was a senior lead project engineer at Emerson Climate Technologies, where he had been working for 20 years. Jeff testified that he moved to a four-bedroom home in Celina, Ohio four years ago. He lived there with his wife, Renee, and his son Kyle, who was 22 years old but had developmental delays and was under his guardianship. From the summer of 2013 until January 2020, L.H. had also lived with them. Jeff claimed that while L.H. lived with them, she had been doing all right in school

and the family got along very well together.

{¶ 32} Although they had moved to the Celina school district, L.H. remained in the St. Henry school system. According to Jeff, L.H. used to be involved in cheerleading, track, and cross-country. L.H. had fairly good attendance at school but she had issues with stomach problems so she missed a few days here and there. He testified that L.H. was probably a "C" or "B" student and that she struggled with tests but was getting passing grades. He admitted that L.H. had experienced bullying but said that the Sheriff's Office got involved, as well as the school, and the issues were addressed properly. L.H. also had a falling out with her friends as a teenager but she had made new friends.

{¶ 33} L.H. had been in counseling with Aaron Kuhn since August 2013. According to Jeff, L.H. went into counseling as a result of L.H.'s making a false allegation against him. Although L.H. was in counseling, Jeff admitted that L.H. had two attempted suicides while she was in his custody, although he claimed there were no actual attempts, just thoughts of suicide. On February 25, 2019, L.H. was admitted to Parkview because she had suicidal thoughts. She was released on March 1, 2019, and recommended to continue her counseling. Jeff claimed that the suicidal ideations were the results of Jared no longer living with them and the bullying L.H. received. However, he later acknowledged that the major stressor for L.H. was the fighting between him and Pam. He admitted that during the family session before L.H. was released, L.H. reported that she did not get along with her stepmother and felt that Renee was physically abusive to Kyle. Jeff conceded that L.H. had a second thought of suicide also in 2019 while L.H. was in his custody.

**{¶ 34}** Jeff admitted that he had slept in L.H.'s bed before and explained that it would occur during times when he woke up in the middle of the night and could not get back to sleep because of his wife's snoring, or he would fall asleep watching television in L.H.'s room. However, he denied sleeping in the bed when L.H. was also in the bed.

**{¶ 35}** Jeff claimed that L.H. would ask him for back rubs or to rub her ankles because she had growing pains and had back issues on and off. The first time he was made aware that L.H. was uncomfortable with the massages was on January 2, 2020, when L.H. reported that she had experienced discomfort with him being in her room and touching her. Jeff testified that he did not go into her room again after that or he would make sure Renee was around at the same time.

**{¶ 36}** Jeff believed accusations were made against him as a result of Pam's manipulating the children. He claimed that allegations would come any time after Pam had extended time with the children. He stated that there had been a total of four allegations against him, and he had cooperated with police and Children Services every time. Each time the investigations came back as unsubstantiated and he had never been charged criminally. Jeff claimed that all of L.H.'s concerns were fabricated, including the allegations of inappropriate behavior with L.H. and the concerns about abuse of Kyle. Because all of the accusations had been unsubstantiated, Jeff asserted that it proved L.H. lied and was not a truthful individual. However, he did admit that L.H. had not recanted the recent allegations.

**{¶ 37}** Jeff claimed that Pam had interfered with his contact with L.H. Jeff testified that he had filed multiple contempt motions against Pam for previously not returning the

children to him and that Pam had been found in contempt. Jeff stated that, on May 23, 2020, he received Snapchat messages from L.H. to him and Renee. But that evening, the messages ceased and he had been blocked from all forms of messaging with L.H. since then. He was granted in-person visitation with L.H. shortly thereafter.

{¶ 38} In August 2020, Jeff and L.H. had a family assessment with Dr. Harris in Dr. Harris's office. Jeff claimed he was not aware of any order for him to attend counseling and that he did take some courses for sex addiction. He did not disclose that information to Dr. Harris during his assessment. After the session, it was alleged that Jeff had touched L.H. inappropriately.

{¶ 39} During a Sunday visitation on November 8, 2020, Jeff, Renee, Kyle, and L.H. went to Renee's parents' house. After they had a family meal, Jeff said they went out to the front yard and took family photos together. The following day, L.H. made an allegation that Jeff had grabbed her butt during the photo session. He denied touching her butt and claimed the accusation was absolutely absurd. During the next visitation, on November 15, 2020, Jeff said that he and Renee confronted L.H. about the allegations, asking why she would report that he had touched her butt and showing L.H. the pictures from the week before. He claimed that L.H. then changed her story.

{¶ 40} Jeff testified that he loved L.H. and wanted to do what was best for her. He was concerned that Pam's husband was a sex offender and was also concerned about L.H.'s schooling. He claimed that L.H.'s attendance had been slipping since she had been returned to Pam's custody and that her grades had really suffered.

{¶ 41} Dr. Gordon Harris was a court appointed psychologist who was asked to

make recommendations regarding custody and parenting time. Dr. Harris spoke to Pam, Jeff, both step-parents, Jared, and L.H. For each of the individuals, he conducted interviews, observed a family session, and administered various tests.

{¶ 42} Dr. Harris testified about the results of the evaluations, finding that both parents had various parenting strengths and weaknesses. However, he found that L.H. was a very troubled individual who felt divided loyalties, like having a dual life with her parents. He testified that L.H. had intense anxiety, with indications of past trauma, although he was unable to determine the nature of the trauma. Her coping was very poor and she was an emotional wreck. As the youngest of the siblings, L.H. was used to having older children look out of her and take care of her. Since they were gone, it was difficult for her to take on the role of looking out for herself. In the Bricklin Perceptual Scales Test, L.H. rated her mother higher than her father on 28 of the 32 possible areas. According to the test results, L.H. perceived Pam as being significantly better able to serve as primary parent.

{¶ 43} L.H. reported to Dr. Harris that Jeff would touch her inner thighs and caress her body and that she started living with Pam because Jeff was coming into bed with her. L.H. indicated she felt uncomfortable, but Jeff would not stop, so she told protective services and her school about it. Her concerns were about how Jeff was touching her. She also shared a concern of Jeff getting into bed with her half-drunk when she only had her bra and underwear on and Jeff only had his underwear on.

{¶ 44} Although L.H. told Dr. Harris that she wished to live at Pam's home, Dr. Harris recommended that L.H. reside with her father and that she continue to have a role

in Pam's family as well. Dr. Harris believed that L.H. acted more appropriately when she was with Jeff's family during the family session and, therefore, determined Jeff's home would be more stable for L.H. than her mother's home. This was based on his observation of L.H. cheating while playing a game with Pam's household, causing him to believe that L.H. got away with a lot of things while at Pam's home that she should not get away with. He was aware of the prior allegations against Jeff, but because they had all been unsubstantiated, he did not perceive Jeff as a danger to L.H. Had they not been unsubstantiated, it would have affected his recommendation.

{¶ 45} Dr. Harris was notified that L.H. had alleged Jeff touched her thigh during the family session after he completed his evaluation, but he did not re-evaluate L.H. or consider the allegation in his analysis because his report was already done. He commented that their session would have been the perfect time for L.H. to say something, but she did not.

{¶ 46} Renee, Jeff's wife, testified that she and Jeff had a very healthy relationship. She primarily took care of Kyle and stated she would never abuse him. Until January 2020, L.H. lived with them in their four-bedroom house. L.H. had her own bedroom on the main level just down from her and Jeff's room, and Kyle had his own room in the basement. Renee claimed that she and L.H. had a pretty good relationship and that Jeff and L.H. had a very loving relationship. She testified that L.H. and Jeff interacted a lot and spent a lot of time together doing things like shopping. She stated that he would rub L.H.'s back, shoulders, and feet but that L.H. liked it and it never seemed creepy or inappropriate. Renee also did the same things for L.H. Renee denied ever seeing Jeff

drunk around the kids or interacting inappropriately with L.H. She was completely surprised about the allegations on January 2, 2020, and she and Jeff fully cooperated with the investigation.

{¶ 47} Renee testified about the visitation with Jeff at her mother's house where L.H. later accused Jeff of touching her butt. According to Renee, when she and Jeff confronted L.H. the next week, L.H. changed her story to say that he could have touched her. Renee denied yelling at L.H., who got upset and ran out of the house. Renee claimed that Jeff did not touch L.H.'s butt during the photos.

{¶ 48} Renee stated she had seen the Snapchat photo of Jeff sleeping on L.H.'s bed but asserted that it was taken during the daytime and there was nothing inappropriate about it. She stated that she tends to snore so sometimes, if L.H. is not in her bed, Jeff will sleep there. If L.H. was there, he would go to the living room and sleep on a couch. She did not think there was anything sinister about Jeff's sleeping in L.H.'s bed.

{¶ 49} Renee testified that L.H. had talked about taking pills to overdose, but that she had not actually done it. She believed L.H. was under a lot of stress from her mother and from school, which is what caused her to end up at Parkview in February 2019.

{¶ 50} Jennifer Walters was the appointed GAL for the original divorce case in 2008 and had been reappointed during various custody disputes since then. She testified that she believed it would be in L.H.'s best interest for Jeff to be designated the residential parent and legal custodian. She recommended Pam have parenting time pursuant to the standard order unless a therapist of L.H.'s would determine that it was detrimental to her. She recommended L.H. be enrolled in intense psychotherapy to help

address the mental health concerns previously raised.

{¶ 51} The GAL was concerned about future alienation, which had been an ongoing issue since the original divorce. She indicated that the parents should not be happy with themselves because L.H. was receiving the brunt of their animosity for each other.

{¶ 52} L.H. disclosed to the GAL that Jeff would come into her room when she was only in her bra and underwear and he would rub her back. L.H. also stated that Jeff had tickled her inner thigh. L.H. did not disclose other instances of alleged sexual misconduct, but the GAL was aware of the allegations. However, the GAL did not believe L.H., because the allegations had been unsubstantiated and no criminal charges had been brought, and also because both Alysia and L.H. had recanted prior, similar allegations. While L.H. admitted to the GAL that the 2013 allegations had been made up, L.H. did not recant the 2020 allegations.

{¶ 53} The GAL testified that Kuhn, L.H.'s previous therapist, explained to her how L.H. was in a double-bind, meaning that she would receive conflicting information from each of her parents and she was in a tug-of-war between which parent she should be loyal to. On October 31, 2018, L.H. entered a "no harm contract" in which L.H. agreed that pills and knives were to be kept in a safe place. This was done because L.H. had discussed cutting and, on one occasion, had taken pills and had to go to the hospital. L.H. had reported to Kuhn that she was uncomfortable at Jeff's house and would get tickled there and did not like it.

{¶ 54} The GAL acknowledged that on January 2, 2020, Kuhn recommended L.H.

be taken to the emergency room for a suicide screening because L.H. said she did not want to live anymore. At that time, Renee informed Kuhn that L.H. had reported she was uncomfortable at Jeff's home and would get tickled there which she did not like. On January 13, 2020, Jeff, Renee, and L.H. met with Children Services and entered a safety plan which included Jeff not going into L.H.'s room and not physically touching her. According to the GAL, L.H. reported that once Children Services got involved, Jeff did not do it again.

{¶ 55} The GAL further testified that L.H. was stressed out when she had to go see her father. L.H. would not have energy and felt uncomfortable, but she felt safer when her brothers were there. L.H. did not want to visit Jeff during the week because her brother was unable to go with her. When L.H. first heard about the visitations with Jeff increasing, she could not concentrate at school and had to be sent home. L.H. expressed to the GAL that she desired to stay with Pam but see Jeff for limited periods with a brother present.

{¶ 56} An in camera interview with L.H. was conducted with the magistrate after the final hearing. On May 7, 2021, the magistrate issued a decision and order that recommended designating Pam the residential parent of L.H. and granting supervised parenting time to Jeff. The magistrate further recommended that Pam be found in contempt for the failure to pay her share of the uninsured medical expenses. Jeff filed an objection to the magistrate's decision, to which Pam responded.

{¶ 57} On October 15, 2021, the trial court adopted the magistrate's decision and overruled Jeff's objections. The trial court's decision also ordered Jeff to file an

income/expense affidavit within seven days to determine the amount of child support. Jeff did not submit anything to the court or request a hearing. On October 29, 2021, the trial court entered a judgment ordering Jeff to pay child support.

**{¶ 58}** Jeff filed a timely notice of appeal.

## II. First Assignment of Error

**{¶ 59}** The first assignment of error reads:

THE TRIAL COURT ABUSED ITS DISCRETION IN FINDING THAT THERE HAS BEEN A CHANGE IN CIRCUMSTANCES THAT HAS OCCURRED WITH RESPECT TO BOTH PARENTS AND THE MINOR CHILD, IN FINDING THAT A MODIFICATION OF THE RESIDENTIAL PARENT IS NECESSARY TO SERVE THE BEST INTEREST OF THE CHILD, AND IN FINDING THAT THE HARM LIKELY TO BE CAUSED BY A CHANGE OF ENVIRONMENT IS OUTWEIGHED BY THE ADVANTAGES OF THE CHANGE OF ENVIRONMENT TO THE CHILD WHEN IT DESIGNATED APPELLEE AS THE RESIDENTIAL PARENT AND LEGAL CUSTODIAN OF THE MINOR CHILD.

## a. Applicable Law and Standard of Review

**{¶ 60}** "[A] court which renders a custody decision in a divorce case has continuing jurisdiction to modify that decision." *In re Poling*, 64 Ohio St. 3d 211, 215, 594 N.E.2d 589 (1992). "R.C. 3109.04 governs the domestic relations court's allocation of parental rights and responsibilities and sets forth the procedures and standards courts are to use in proceedings pertaining to such matters." *Hanna v. Hanna*, 177 Ohio App.3d 233,

2008-Ohio-3523, 894 N.E.2d 355, ¶ 10 (10th Dist.), citing *Braatz v. Braatz*, 85 Ohio St.3d 40, 706 N.E.2d 1218 (1999).   In order for a trial court to modify a prior decree allocating parental rights and responsibilities for the care of minor children, the court must find, "based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child." R.C. 3109.04(E)(1)(a).   "For purposes of R.C. 3109.04(E)(1)(a), the reference to the 'prior decree' means the last decree that actually allocated parental rights."   *Hartley v. Hartley*, 2d Dist. Montgomery No. 27646, 2017-Ohio-8494, ¶ 9, citing *In re M.B.*, 2d Dist. Champaign No. 2006-CA-6, 2006-Ohio-3756, ¶ 10.

{¶ 61} The court must retain the residential parent designated by the prior decree unless a modification is in the best interest of the child and one of three additional factors applies.   *Fisher v. Hasenjager*, 116 Ohio St.3d 53, 2007-Ohio-5589, 876 N.E.2d 546, ¶ 21, citing R.C. 3109.04(E)(1)(a).   The applicable factor in this case required the trial court to find that "[t]he harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."   R.C. 3109.04(E)(1)(a)(iii).

{¶ 62} "In considering a motion for a change of custody, the trial court must first determine whether there has been a change of circumstances of the child or the residential parent since the prior court order."   *Wilburn v. Wilburn*, 144 Ohio App.3d 279, 286, 760 N.E.2d 7 (2d Dist.2001), citing *Wyss v. Wyss*, 3 Ohio App.3d 412, 414, 445 N.E.2d 1153 (10th Dist.1982).   While not defined in R.C. 3109.04(E), a "change of

circumstances" has been held to pertain to "an event, occurrence, or situation which has a material and adverse effect upon the child." (Citations omitted.) *In re I.E.*, 2d Dist. Montgomery No. 28646, 2020-Ohio-3477, ¶ 15. The change in circumstance "must be a change of substance, not a slight or inconsequential change." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). "In determining whether a change in circumstances has occurred so as to warrant a change in custody, a trial judge, as the trier of fact, must be given wide latitude to consider all issues which support such a change." *Id.* at paragraph two of the syllabus.

{¶ 63} This Court reviews a trial court's modification of custody under R.C. 3109.04 for an abuse of discretion. *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary, or unconscionable." (Citation omitted.) *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

b. **Change of Circumstances**

{¶ 64} In this case, the last decree that allocated parental rights was in 2013, wherein Jeff was designated residential parent and legal custodian of the four youngest children (the eldest having been emancipated). The trial court found a change of circumstances based on the following factors: (1) the prior decree order involved five children residing with Jeff but now the older four are emancipated adults with one still

living in Jeff's home, (2) the current motion involved residential placement for only the youngest minor child, (3) Jeff had moved homes, (4) Pam had moved homes, (5) in 2013, L.H. was approximately 8 years old but was now almost 17 years old; (6) both the parents were 8 years older and remarried; and (7) L.H. had, in recent years, demonstrated symptoms of emotional distress and anxiety that resulted in professional counseling intervention with no similar issues noted in 2013. October 15, 2021 Judgment Entry Adopting Magistrate's Decision. Because we find that the trial court's factors sufficiently demonstrated a change in circumstances, we will not delve into the magistrate's determination.

{¶ 65} In challenging the trial court's finding of a change in circumstances, Jeff first contends that the proper analysis is to focus on the circumstances of the child or the child's residential parent, not the non-residential parent. Therefore, factors 4 and 6 pertaining to Pam were irrelevant. Jeff also claims that factor 3 should have been disregarded because his move was not harmful to L.H. As to factors 1, 2, 5, and 6, Jeff argues that those were merely due to the passage of time and were insufficient to find a change of circumstances. As to the final factor, Jeff acknowledges that mental health issues may constitute a change of circumstances but claimed that the record did not demonstrate that "no similar issues were noted in 2013."

{¶ 66} The plain language of R.C. 3109.04(E)(1)(a) requires the trial court to find that "a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree[.]" This case does not involve a shared parenting decree thus, changes to the non-custodial parent were

irrelevant in the determination of a change of circumstances. *Cireddu v. Clough,* 11th Dist. Lake No. 2012-L-103, 2013-Ohio-2042, ¶ 40, citing *Walsh v. Walsh*, 11th Dist. Geauga No. 2004-G-2587, 2005-Ohio-3264, ¶ 19. Since Jeff was the residential parent, factors 4 and 6 pertaining to changes to Pam's circumstances could not be considered in the change in circumstances analysis. However, these were not the only factors the trial court considered in finding that there was a change in circumstances.

{¶ 67} While Jeff appears to contend that each factor alone must demonstrate a change in circumstances that is not the proper approach. Rather, the trial court may consider the total effect of the facts alleged to have resulted in a change of circumstances. *Wallace v. Willoughby*, 3rd Dist. Shelby No. 17-10-15, 2011-Ohio-3008, ¶ 27. "A change of circumstances can be upheld based on a collection of findings as to how the lives of the residential parent and the child have changed since the prior decree." *Gibson v. Gibson*, 7th Dist. Columbiana No. 17 CO 0034, 2018-Ohio-2772, ¶ 42.

{¶ 68} In this case, the totality of the trial court's factors demonstrated that there was a change in circumstances. In particular, a significant amount of time had passed between the last decree allocating parental rights and responsibilities and the current motion. While the passage of time alone may not be sufficient to constitute a change of circumstances, under the change in circumstances analysis, advancing age is a relevant consideration. *In re Brayden James*, 113 Ohio St.3d 420, 2007-Ohio-2335, 866 N.E.2d 467, ¶ 18, citing *Perz v. Perz*, 85 Ohio App.3d 374, 377, 619 N.E.2d 1094 (6th Dist.1993). This is because as a child ages from one stage in life to a considerably different phase of their development, their needs change along with their physical, mental, and moral

development. *Perz* at 377. "A child crossing a developmental age in his or her life has been found to be enough, along with the passage of time, to constitute a change in circumstances." *Carr v. Kaiser*, 3d Dist. Defiance No. 4-11-11, 2012-Ohio-2688, ¶ 41, citing *Perz* at 377.

{¶ 69} At the time of the last decree in July 2013, L.H. was 8 years old, attended elementary school, and lived with three of her older siblings. At the time of the trial court's decision in October 2021, L.H. was nearly 17 years old, a sophomore in high school, and the only minor child remaining under the court's continuing jurisdiction. Dr. Harris noted that L.H. was the youngest in the family and was used to having the older children look out for her. He further observed that, since the siblings were gone, L.H. had had a difficult time having to take care of herself.

{¶ 70} Significantly, L.H. had developed serious mental health issues since the time of the last allocation of parental rights and responsibilities. Considering the notable problems that arose beginning in 2018, the trial court correctly identified that there was no evidence of similar mental health issues in the record from 2013.

{¶ 71} On October 31, 2018, L.H. entered a "no harm contract" after a suicide assessment was completed. The night before, L.H. had taken pills and had gone to the hospital after feeling sick. Because there were concerns about L.H.'s cutting herself and taking pills, per the contract, both pills and knives were to be kept in a safe place.

{¶ 72} In February 2019, L.H. was hospitalized at Parkview for being suicidal and attempting to overdose on pills. She also had a second suicide attempt in 2019 while in Jeff's custody. In January 2020, L.H. was taken to the hospital again for a suicide

screening because she stated that she did not want to live anymore.

{¶ 73} As a freshman in high school during the 2019-2020 school year, L.H. had a lot of emotional issues and frequently met with her guidance counselor and principal.   In the fall of 2020, L.H. had several incidents in which she would have visitation with Jeff on Sundays and come to school rattled on Mondays.   At school, L.H. would appear very upset, crying, and breathing hard.   These incidents would interrupt L.H.'s schooling to the point that Pam would have to pick her up from school because she could not make it through the school day.

{¶ 74} In February 2020, L.H. was diagnosed with PTSD and moderate major depressive disorder and regularly met with her counselor, Morgan Carter.   According to Carter, there were concerns of self-harm based on statements L.H. had made, particularly in September and November 2020.   L.H. had physical manifestations of her stress and anxiety, including frequent stomach aches, crying, and nightmares or trouble sleeping. L.H. had been prescribed medication to help with her symptoms.

{¶ 75} On November 15, 2020, after Jeff and Renee confronted L.H. about the butt touching incident the prior week, L.H. ran away to the neighbor's home.   When L.H. spoke with police, she was very distraught, crying, and was worked up to the point of feeling nauseous.   L.H. explained that she was worried for her safety and was going to harm herself if she had to return to her father's residence.   According to Sgt. Heinl, L.H. was clearly scared for her safety.

{¶ 76} None of the medical diagnoses, suicidal hospitalizations, breakdowns at school, or threats of self-harm were present in 2013.   Based on our review of the record,

we cannot find that the trial court abused its discretion in finding that there had been a change of circumstances since the last decree allocating parental rights and responsibilities.

**c.      Best Interest and Harm**

{¶ 77} After finding that there was a change of circumstances, the trial court considered the best interests of the minor child and whether any harm likely to be caused by a change of environment was outweighed by the advantages of the change of environment.   In determining a child's best interest, R.C. 3109.04(F)(1) instructs courts to consider all relevant factors, including, but not limited to: (a) the wishes of the parents regarding the child's care; (b) if the court interviewed the child, the child's wishes expressed to the court; (c) the child's relationship with his/her parents and others who might significantly affect his/her best interest; (d) the child's adjustment to his/her home, school, and community; (e) the mental and physical health of all persons involved; (f) the parent more likely to facilitate parenting time and visitation; (g) child-support payment issues; (h) whether either parent or member of the household has previously been convicted of certain enumerated offenses; and (i) whether one parent lives, or plans to live, outside Ohio.   R.C. 3109.04(F)(1).

{¶ 78} Jeff does not contend that the trial court failed to consider all the best interest factors.   Rather, he alleges that the magistrate, and thus the trial court, failed to properly weigh the best interest factors in determining that it was in L.H.'s best interest to reside with Pam.   Jeff focuses on only two of the factors, (e) and (f), to suggest that the record did not support the trial court's decision.

{¶ 79} With regard to R.C. 3109.04(F)(1)(f), Jeff alleges that the magistrate erroneously found that Pam had not denied Jeff parenting time with the minor child. However, what the magistrate said was, "[d]uring the pendency of this action, there has been no allegations or reports concerning Mother denying Father parenting time with [L.H.]. * * * Based on the evidence presented, it appears that Mother facilitated and transported [L.H.] to all Court Ordered visits with Father." May 7, 2021 Magistrate's Decision. Based on our reading of this statement, the magistrate was limiting this particular determination to the pending 2020 motion. Notably, just a few paragraphs later, the magistrate stated that, "[i]n reviewing the file contents and other matters of record filed herein, it appears that both parents demonstrated non-compliance with Court Orders regarding child-related matters and parenting time." *Id.* The record supports the magistrate's finding with regard to the pendency of the present filing as well as the history of the case. The trial court, therefore, did consider this factor and reasonably did not find that it necessitated keeping Jeff the residential and custodial parent of L.H. in comparison to the totality of the other best interest factors.

{¶ 80} As it relates to R.C. 3109.04(F)(1)(e), L.H. was the only individual identified that had significant mental health issues. Jeff alleges that the court erred in finding that Pam was addressing L.H.'s emotional needs and was the only parent willing to listen to her because he had obtained counseling for L.H. first with Kuhn. He also relies on Dr. Harris's recommendation to support that he would be best able to care for L.H.'s mental health.

{¶ 81} While it is true that Jeff obtained counseling for L.H., it was because of the

false allegations of inappropriate touching in 2013, not for the significant mental health issues that arose later on and that were exacerbated by Jeff's relationship with L.H. By 2018, L.H. was experiencing significant mental health troubles, including being taken to the emergency room and even hospitalized for suicidal ideations. These incidents occurred while Jeff was the residential parent and legal custodian, which seems to indicate that he was not sufficiently addressing L.H.'s needs.

{¶ 82} Furthermore, Jeff ignores the evidence that he was a significant cause of L.H.'s distress, either by his own actions with L.H. or the stress of his and Pam's inability to get along with each other. Several witnesses testified about L.H.'s negative reactions to having visitations with Jeff or learning she would have more visitations with Jeff and about how she wanted her brother to supervise the visitations. There were multiple reports made to law enforcement, counselors, and Children Services about Jeff inappropriately touching L.H. As the trial court observed, whether or not the reports were accurate, Jeff failed to appreciate the effect his actions had on L.H., particularly considering he was the subject of previous allegations of inappropriate touching dating as far back as the original divorce proceedings. The fact that, even after a history of unsubstantiated allegations, Jeff continued to give L.H. massages or sleep in her bed, both of which he admitted doing, demonstrated that he lacked knowledge of appropriate boundaries and conduct with his daughter. Rather, Jeff seemed to blame everything on either L.H. or Pam rather than accepting any accountability for his own actions.

{¶ 83} The magistrate specifically found that both Jeff and Renee were not credible witnesses, particularly when discussing L.H.'s allegations against Jeff and their

interactions with her. This was based on several observations, including their vocal tones and demeanors on the witness stand, and that their answers appeared rehearsed. Where the trial court conducted a de novo review of the evidence and did not take any additional evidence before adopting the magistrate's decision as its own, "the judgment of the magistrate on issues of credibility is, absent other evidence, the last word on the issue for all practical purposes." *Mandelbaum v. Mandelbaum*, 2d Dist. Montgomery No. 21817, 2007-Ohio-6138, ¶ 103, quoting *Quick v. Kwiatkowski*, 2d Dist. Montgomery No. 18620, 2001 WL 871406, *4 (Aug. 3, 2001). Thus, we defer to the credibility determinations of the trial court.

{¶ 84} Although Jeff focuses on only two of the factors, the trial court was to consider all the relevant factors, and each factor may not necessarily carry the same weight depending on the facts before the trial court. *Brammer v. Brammer*, 3d Dist. Marion No. 9-12-57, 2013-Ohio-2843, ¶ 41. Moreover, a trial court was not limited to the enumerated factors listed in R.C. 3109.04(F), but could consider any other relevant factors in making a determination of child custody. *Id.*

{¶ 85} Significantly, the trial court emphasized that the fractured relationship between Jeff and L.H. strongly weighed in favor of finding that the benefits of changing the residential parenting arrangement outweighed any detriment. The trial court also remarked on other factors weighing in favor of the change in custody, including that L.H. had been doing better in school since being in Pam's custody, that the relationship between L.H. and Pam was positive, that L.H.'s school circumstances had improved, and that Pam had indicated a willingness to allow Jeff to have parenting time which had

occurred during the pendency of the proceedings without many problems.

**{¶ 86}** The trial court found that Pam had a bonded relationship with L.H. and appeared to be trying to protect her based on the allegations that were made. Pam responded and intervened appropriately when contacted by the school. Pam obtained counseling for L.H. when L.H. came into her custody. When L.H. had issues, Pam reached out to the principal, the counselor, and others to try to help L.H. cope. Thus, while L.H. was bonded with her mother and siblings, there was a definite struggle between L.H. and Jeff that supported the trial court's decision to change custody of L.H. to Pam.

**{¶ 87}** While Jeff wants this Court to give different weight to factors he contends were in his favor, that is not our role. As we have said, "[t]he discretion which a trial court enjoys in custody matters should be afforded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Beismann v. Beismann*, 2d Dist. Montgomery No. 22323, 2008-Ohio-984, ¶ 20, citing *Miller*, 37 Ohio St.3d at 74, 523 N.E.2d 846. It was the role of the trial court to determine the relative weight to assign to each factor, in relation to the others, when determining L.H.'s best interest, and the record supports the trial court's findings. Having thoroughly reviewed the record before us, we conclude that the trial court did not abuse its discretion when it held that it was in L.H.'s best interest to designate Pam the residential parent and legal custodian and that the benefits of the change in custody outweighed any likely harm. Jeff's first assignment of error is overruled.

## III.   Child Support Order

**{¶ 88}** In his second assignment of error, Jeff alleges the following:

THE TRIAL COURT ERRED WHEN IT ESTABLISHED A CHILD SUPPORT ORDER, SUA SPONTE.

{¶ 89} Jeff argues that the trial court lacked jurisdiction to address child support and, therefore, the trial court abused its discretion when it sua sponte established child support. We disagree.

{¶ 90} "The court in which a decree of divorce is originally rendered retains continuing jurisdiction over matters relating to the custody, care, and support of the minor children of the parties." *Loetz v. Loetz*, 63 Ohio St.2d 1, 2, 406 N.E.2d 1093 (1980). The continuing jurisdiction of the court is invoked when a motion is filed in the original action and notice of the filing is served in the manner provided in the civil rules. Civ.R. 75(J). Thus, when a party files a motion for a change of custody, the trial court has continuing jurisdiction to modify the parties' custody arrangement and any matter related to such motion, including modification of child support. *McCandlish v. McCandlish*, 5th Dist. Licking No. 13-CA-37, 2013-Ohio-5066, ¶ 30. This is because when parental rights and responsibilities are modified and re-allocated to the other parent, the court is to designate that parent as the residential parent and legal custodian of the child as set forth in R.C. 3109.04(A)(1). *Dyer v. Gomez*, 7th Dist. Noble No. 21 NO 0484, 2022-Ohio-1127, ¶ 74. R.C. 3109.04(A)(1) explicitly states that the court should "divide between the parents the other rights and responsibilities for the care of the children, including, but not limited to, *the responsibility to provide support for the children* and the right of the parent who is not the residential parent to have continuing contact with the children." (Emphasis added.)

{¶ 91} Because Pam filed a motion for a change of custody, the trial court had continuing jurisdiction to also consider a modification of child support in the event of a change of custody. Further, Pam's motion for a change of custody specifically requested child support. In the January 27, 2020 motion, Pam requested the trial court to "grant her Ex-Parte Temporary and Permanent Order of custody and order of child support of the minor child[.]" Pam likewise submitted an application for child support and an affidavit of income and expenses. Because Pam properly invoked the jurisdiction of the trial court by filing her motion for a change of custody and requesting child support, the trial court had jurisdiction to address it.

{¶ 92} In preparation for the final hearing, the trial court ordered the parties to file with the court "an affidavit of income, expenses and financial disclosure within fourteen (14) days of this order, unless previously filed in this case." July 2, 2020 Magistrate's Order and Hearing Notice. The record does not reflect that Jeff filed any of the documents ordered. Although the magistrate neglected to consider the issue of child support in its decision, the trial court specifically addressed it and ordered Jeff to "file an income/expense affidavit within seven (7) days hereafter. Child support will then be determined or the issue may be set for hearing, as the Court may determine." October 15, 2021 Judgment Entry Adopting Magistrate's Decision. Jeff failed to comply with the trial court's order or to object to the trial court's consideration of child support, and an entry establishing child support was entered on October 29, 2021.

{¶ 93} In its decision, the trial court found that the basis for the change in child support was due to the change of custody. The child support order was established

using Pam's financial documents filed on January 27, 2020, and Jeff's financial documents provided on October 11, 2012. The trial court used the standard child support computation worksheet to determine the amount of child support, and the worksheet reflecting this computation was attached to, and incorporated within, the trial court's decision.

{¶ 94} Pam's motion requesting child support, in addition to the request for the change of custody, invoked the trial court's continuing jurisdiction and the issue of child support was properly raised. Because Jeff was placed on notice and was given an opportunity to address the request for child support, we overrule his second assignment of error.

## IV. Conclusion

{¶ 95} Having reviewed the entire record, we conclude that the evidence supported the trial court's finding of a change of circumstances. We also conclude that the trial court did not abuse its discretion in finding that it was in the child's best interest for Pam to be designated the residential and legal custodian of L.H. and that the advantages of the change of environment outweighed the harm likely to be caused by a change of environment. Further, the trial court did not err in ordering the imposition of child support as a result of a change in custody when Jeff was on notice of the request and had an opportunity to respond.

{¶ 96} Having overruled both assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

WELBAUM, J. and EPLEY, J., concur.


Copies sent to:

Jennifer S. Delaplane
William R. Zimmerman, Jr.
Hon. Jonathan P. Hein